**INTERNATIONAL ASSOCIATION OF FIREFIGHTERS LOCAL 624, James Naegelin, Robert Savage, Paul Vidal, Lawrence Sutton, III, Alan Boozikee, Herman Cantu, Appellants,**

v.

**CITY OF SAN ANTONIO, Appellee.**

No. 04–88–00320–CV.

Court of Appeals of Texas, San Antonio.

Nov. 20, 1991.

Rehearing Denied Jan. 27, 1992.

B. Craig Deats, Van Os, Deats, Rubinett & Owen, P.C., Austin, for appellants.

Alberto J. Pena, Paula Dlugosz, Asst. City Attys., San Antonio, for appellee.

Before BIERY, CARR and BISSETT, JJ.

## ON APPELLANTS' AND APPELLEE'S MOTIONS FOR REHEARING

BISSETT, Justice.[1]

The opinion of this Court in this case, which was delivered and filed on July 17, 1991, is withdrawn and this opinion is substituted therefor. The judgment of this Court, which was filed on July 17, 1991, is also withdrawn and a new judgment is substituted therefor.

Both plaintiffs and defendant have filed motions for rehearing. Plaintiffs' motion is granted and defendant's motion is denied.

This is a suit by International Association of Firefighters Local 624, James Naegelin, Robert Savage, Paul Vidal, Lawrence Sutton, III, Alan Boozikee, and Herman Cantu (Plaintiffs) to have declared invalid a portion of Ordinance 63227 of the City of San Antonio (City) which transferred certain firefighters and replaced them with civilians. The individual plaintiffs were employed as sworn (classified) personnel in the City's fire department.

Suit was filed on February 24, 1987. Following a trial to the court, judgment was rendered on April 25, 1988, that plaintiffs take nothing. Plaintiffs have appealed.

This case involved the decision of the City of San Antonio to "civilianize" certain positions in the Fire Prevention, Fire Dispatch, and Emergency Medical Services Dispatch divisions of the San Antonio Fire Department—i.e., to replace classified (sworn) personnel hired in accordance with TEX.REV.CIV.STAT.ANN. art. 1269m, the Firemen's and Policemen's Civil Service Act, with civilian personnel not covered by the Act.[2]

We summarize the evidence (which is voluminous) in this case. In doing so, we do not identify any particular witness. Firefighters employed by the City are hired and promoted as a result of competitive procedures established by the Firemen's and Policemen's Civil Service Act (the Act). The City of San Antonio is obligated under the provisions of TEX.REV.CIV.STAT. ANN. art. 5154c-1, the Fire and Police Employee Relations Act, to collectively bargain with the appellant, International Association of Firefighters, Local 624 (Union), as the exclusive representative of all classified firefighters with the exception of the fire chief only. The collective bargaining agreement between the City and the Union specifically excepts civilian personnel of the fire department from the bargaining unit of firefighters represented by the Union. It is through the collective bargaining process that wage rates are set for classified firefighters of the City's fire department. The City is contractually obligated to pay firefighters in the various classifications at the rates specified in the collective bargaining agreement.

The City's budget year begins on October 1 of each year. Fiscal year (FY) 1986–87 covered the period from October 1, 1986, to September 20, 1987. During FY 1985–86, the City became aware of an estimated budget shortfall of $11,300,000.00. This was due primarily to the loss of some grant monies the City had anticipated receiving. There were also shortfalls in anticipated revenue from City Public Service and the sales tax.

As planning for the FY 1986–87 budget commenced, the City directed its budget department to prepare a fire staffing study for the purpose of providing opportunities to offset the cost of adding new classified positions to the fire department to meet

1. Assigned to this case by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.005 (Vernon 1988).

2. Since the filing of this action, TEX.REV.CIV. STAT.ANN. art. 1269m, has been repealed and re-enacted in codified form. Act of June 2, 1947, 50th Leg., R.S., ch. 325, 1947 Tex.Gen. Laws 550, as amended, *repealed by* Act of May 1, 1987, ch. 149 § 49(1), 1987 Tex.Gen.Laws

1306. The Fire and Police Civil Service Act is now found at TEX.LOC.GOV'T CODE ANN. §§ 143.001–143.134 (Vernon 1988 & Supp.1991). The actions before us took place prior to the codification and are governed by article 1269m. Because the codification entails no substantive change, we will refer to the codified version unless otherwise noted.

operational level needs. The fire staffing study was completed in April, 1986.

At the time of the study, the fire department anticipated needing an additional fifty-four positions in Fire Suppression during FY 1986–87. Forty-five of the positions were to staff three new fire stations that had been built to service newly-annexed areas of the City. Provisions for these positions were considered mandates, or required expenditures, for the FY 1986–87 budget. The remaining nine positions were to implement the first year of a three-year program designed to increase the staffing on the City's twenty-seven pumper trucks from three to four firefighters. The plan to increase pumper truck staffing was considered a "program movement," meaning it was an item of discretionary spending.

In the area of Emergency Medical Services (EMS), which falls under the jurisdiction of the fire department, the City anticipated needing an additional twenty-four firefighters to staff two new modulances which the City planned to purchase during FY 1986–87.

The City's projected FY 1986–87 budget deficit at the time the budget was being proposed was $33.2 million. The city council had instructed city staff to stretch the public's dollar. Recognizing that the City was facing a spending cap referendum, the council insisted upon a balanced budget without an increase in taxes. As to the fire department, the city staff was directed to staff the new fire stations, improve EMS service, and improve the staffing on pumpers as requested by the Union. A fire staffing study, conducted during the budget preparation process, identified opportunities to increase operational level resources without adding new sworn positions by focusing on civilianization as the most cost-effective deployment of personnel at a $250,035.00 savings. The study recommended civilianizing Fire Dispatch over a two-year period. It was projected that the budget goal would be reached through attrition and transfer of employees to new stations, and in EMS Dispatch, the goal would be reached by transfer of employees to new stations. Although all divi-

sions in the fire department were considered by the staff, only those areas where resources could be maximized were identified in the study. The adopted budget increased the number of classified positions in the fire department by sixty, which included only firefighter and fire engineer positions. The number of existing fire captain and fire lieutenant positions remained the same when they were transferred from Fire Prevention to the new fire stations. A Computer Aided Dispatch (CAD) system was implemented prior to civilianization of fire and EMS dispatch personnel so that certain knowledge regarding locations of stations and equipment would not be required of civilian personnel. The classification description for the civilian fire inspector and plans checker did not require experience as a fire lieutenant or a firefighter as did the classification description of fire captain and fire lieutenant, respectively.

The study resulted in the identification of several positions in the fire department occupied by classified firefighters which could be civilianized, thus "freeing" the firefighters occupying those positions to fill vacancies created as a result of the addition of three new stations and the increase in pumper crew sizes. In this way, the fire department could increase operational level resources without adding all fifty-four new positions. The study identified six alternatives whereby the fire department could utilize such redeployment techniques as a means of reducing the number of sworn positions which would have to be created to meet anticipated operational needs. The study was presented to the city council through the city manager for the council's consideration in preparing the FY 1986–87 budget ordinance.

The council adopted its FY 1986–87 budget through passage of Ordinance Number 63227 on July 16, 1986. The ordinance, as enacted, adopted three of the six redeployment proposals contained in the Fire Staffing Study. Specifically, the ordinance calls for the civilianization of the following classified positions:

1. Replacement of 3 Captains and 6 Lieutenants in Fire Inspection and

Plans Checker positions in the Fire Prevention Division with 9 civilians;

2. Replacement of 3 Firefighters in Fire Dispatcher positions with 5 civilians;

3. Replacement of 6 Engineers in EMS Dispatcher positions with 8 civilians.

The eighteen firefighters thus freed from their present positions would be deployed in the following manner: (1) the three captains, six lieutenants, and three firefighters released from Fire Prevention and Fire Dispatch would be utilized to help staff the new fire stations, thus reducing the need for creation of new positions to staff the stations from forty-five to thirty-three; and (2) the seven engineers freed from EMS dispatch positions would be utilized to help staff the two new modulances, thus decreasing the need to create new positions for this purpose from twenty-four to eighteen. In this manner, the need to create new sworn positions was decreased from seventy-eight to sixty. At the same time, the ordinance called for the creation of twenty-two civilian positions to replace the departing sworn firefighters in the jobs of fire inspector, plans checkers, fire dispatcher, and EMS dispatcher.

As a result, the City, in replacing the eighteen sworn firefighter positions with twenty-two civilian positions, anticipated that it could save $204,825.00 in the fire department. Also, the fire department anticipated additional savings through the EMS civilianization of $14,580.00. In December 1986, well after the ordinance had been adopted, the City anticipated that full implementation of the civilianization program would result in a total savings of $308,038.00 for FY 1987–88. This saving was to be achieved simply by paying the civilian employees less money in wages and benefits than the City was required to pay the sworn firefighters under the collective bargaining agreement. At the same time, the civilian employees were going to be performing exactly the same work as had been performed by the sworn firefighters they were replacing.

Only the nine fire inspector and plans checker positions in Fire Prevention were actually civilianized during FY 1986–87.

The positions were civilianized in conjunction with the opening of the three new stations. Thus, one captain and two lieutenants were reassigned from Fire Prevention to Fire Suppression on April 4, 1987, when new Station 42 was staffed. Another captain and two more lieutenants were reassigned from Fire Prevention to Fire Suppression on May 23, 1987, when new Station 43 was staffed. Finally, a third captain and two more lieutenants were reassigned from Fire Prevention to Fire Suppression on September 19, 1987, when new Station 44 was staffed. Six civilian fire inspectors and three plans checkers were hired to replace the division's sworn firefighters in April and July 1987. The EMS dispatch and fire dispatch positions were never civilianized.

The civilianization which occurred in Fire Prevention was a partial civilianization. Before civilianization, there were twenty-one classified, or sworn, firefighter positions in Fire Prevention. Afterwards, there were twelve classified positions and nine civilians. The classified firefighters and civilian employees work side by side performing the exact same work. The only difference between the civilians and classified firefighters is that the civilian employees are paid less money.

The trial court, in its judgment, stated:

No jury having been demanded, the Court, after hearing the evidence, and the argument of counsel, finds that the Defendant City of San Antonio, through its City Council, acted in good faith and did not abuse its discretion in adopting Ordinance No. 63227 which civilianized certain duties previously performed by sworn classified personnel in the Fire Department. However, the Court's findings are limited to the eighteen (18) positions "civilianized" in said Ordinance. The City shall re-assess its decision four (4) years from the effective date of the ordinance, such reassessment to be completed prior to enactment of the budget ordinance for the following year.

In support of the judgment, the trial court made the following fact findings: 1) that the City faced budget shortfalls in FY

1985–86 and FY 1986–87; 2) that the newly-hired civilian employees were performing satisfactorily; 3) that firefighting training is unnecessary to perform the duties of the civilianized positions; 4) that the classified personnel transferred from the civilianized positions can better utilize their firefighting training "in the field"; and 5) that cost savings had been attained and could be expected to continue as a result of the civilianization.

Plaintiffs contend in their first point of error that the trial court erred in ruling that the City's civilianization of classified positions in the fire department's Fire Prevention, Fire Dispatch, and EMS Dispatch divisions was in good faith.

The public policy of Texas embodied in the Act is expressed in section 16a of the former article 1269m:

> [T]he purpose of Firemen and Policemen's Civil Service Law is to secure to the cities affected thereby efficient Police and Fire Departments, composed of capable personnel, free from political influence, and with permanent tenure of employment as public servants.

Act of June 15, 1977, 65th Leg., R.S., ch. 424, § 16a, 1977 Tex.Gen.Laws 1132 (repealed 1987) (current version at TEX. LOC.GOV'T CODE ANN. § 143.001 (Vernon 1988)).

Section 143.003 of the Act defines "Fire fighter"[3] to include those members of the fire department "who perform fire suppression, fire prevention, fire training, fire safety education, fire maintenance, fire communications, fire medical emergency technology, fire photography, or fire administration."

Section 9 of former article 1269m provides in pertinent part:

> All eligibility lists for applicants for original positions in the Fire and Police Departments shall be created only as a result of [civil service] examinations, and no appointments shall ever be made for any position in such Departments except as a result of such examination, which shall be based on the applicant's knowledge of and qualifications for firefighting and work in the Fire Department....

Act of June 15, 1977, 65th Leg., R.S., ch. 424, § 16a, 1977 Tex.Gen.Laws 1132 (repealed 1987) (current version at TEX. LOC.GOV'T CODE ANN. § 143.025 (Vernon 1988)).

Section 143.021(a) of the Act states in relevant part:

> The [Firefighters' and Police Officers' Civil Service] commission shall provide for the classification of all fire fighters and police officers.

The clear intent of the Act is to secure a capable, nonpoliticized fire department by means of a civil service system which utilizes competitive, job-related examinations to govern appointments and promotions.

■ We take judicial notice of the Charter of the City of San Antonio, even though the trial court was not requested to do so and did not announce that it had done so. *Harper v. Killion*, 162 Tex. 481, 348 S.W.2d 521, 523 (1961); *City of Dallas v. Moreau*, 718 S.W.2d 776, 781 (Tex.App.— Corpus Christi 1986, writ ref'd n.r.e.). The Charter shields all of the city's employees from political influence.

■ The correct legal standard for determining the validity of abolition of civil service positions was stated in *City of San Antonio v. Wallace*, 161 Tex. 41, 338 S.W.2d 153 (1960), wherein it was held that a city's actions in abolishing municipal civil service positions are subject to a judicial inquiry into its good faith. *Id.* 338 S.W.2d at 155–56. The supreme court indicated in its opinion that a city might show good faith by demonstrating that its actions were in the interest of economy or the betterment of municipal services, but in addition to considerations of economy and general municipal betterment, the court left open the possibility that other factors might be considered in inquiring into a city's good faith in its abolition of civil service positions. *Id.* at 157. Specifically, the court stated that "the public policy represented by the civil service law" shall enter into the judicial inquiry. *Id.* at 156.

---

**3.** The codification substituted the term "fire     fighter" for the source law term "firemen."

The City is obligated under the provisions of Article 5154c–1 to collectively bargain with plaintiff International Association of Firefighters, Local 624, as the exclusive representative of all classified firefighters with the exception of the fire chief only. The collective bargaining agreement between the City and the Union specifically excepts civilian personnel of the fire department from the bargaining unit of firefighters represented by the Union. It is through the collective bargaining process that wage rates are set for classified firefighters of the City's fire department. Thus, the City is contractually obligated to pay firefighters in the various classifications at the rates specified in the collective bargaining agreement.

■ In order to demonstrate its good faith, a city must show that civilianization would be more satisfactory to the public in general, that it will result in something more than monetary savings, and that the duties of the classified personnel were not merely transferred to others. *Burkhart v. Moore*, 580 S.W.2d 108, 110 (Tex.Civ. App.—Eastland 1979, no writ); *Kiel v. City of Houston*, 558 S.W.2d 69, 72 (Tex.Civ. App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.); *City of Wichita Falls v. Harris*, 532 S.W.2d 653, 658 (Tex.Civ.App.—Fort Worth 1975, writ ref'd n.r.e.); *Welch v. Overton*, 416 S.W.2d 879, 885 (Tex.Civ. App.—Texarkana 1967, writ ref'd n.r.e.).

■ In the case at bar, testimony at trial showed that the training and experience received by a classified firefighter produces a marked benefit in the performance of each of the jobs at issue. In the Fire Prevention division, for example, plans checkers and fire inspectors possess expertise which enables them to understand the relationship between the fire code and the needs of those who fight fires. Additionally, plans checkers and fire inspectors must be free from political pressure which might possibly be exerted by contractors seeking to have their projects pass fire code inspection. In the EMS Dispatch division, civilians without firefighter experience and training, who are unable to conceptualize the situations being faced by firefighters,

are simply unable to perform fire dispatch jobs as effectively as firefighters. Moreover, the firefighters serving as emergency medical service dispatchers are trained as paramedics. When they take calls from the public, they give medical advice over the phone until EMS personnel arrive at the scene. The City proposes that the civilian dispatchers replacing the classified personnel simply read from cards which provide emergency medical information. It is highly unlikely that untrained dispatchers reading from cards could provide emergency medical instruction which is as reliable as that from firefighters trained as paramedics. The difference might prove to be of life-or-death importance in critical instances. Raul Lasoya, Assistant Fire Marshal of the City, testified at trial that use of civilians in fire prevention positions has diminished the quality of service provided by that department, and that it will take a long, long time for the civilians to gain the training and experience necessary to do the job as well as firefighters.

In a very recent decision, *Lee v. City of Houston*, 807 S.W.2d 290 (Tex.1991), several police officers challenged the legality of the city's ordinance which created and staffed positions in the police department with "civilians," complaining that such action was in violation of TEX.REV.CIV. STAT.ANN. art. 1269m. The trial court rendered judgment for the police officers, and the city appealed. The Houston First Court of Appeals reversed and held that the filling of newly created positions within the police department with civilians did not constitute creation of new classifications required to be filled according to the dictates of Article 1269m. *See City of Houston v. Lee*, 762 S.W.2d 180 (Tex.App.— Houston [1st Dist.] 1988), *rev'd*, 807 S.W.2d 290 (Tex.1991). The supreme court reversed the judgment of the court of appeals and in essence, affirmed the judgment of the trial court. The supreme court noted:

Evidence in the present case indicates that the City 'declassified' certain top-level job assignments within the HPD. The trial court found that four newly-

hired, unclassified employees were performing the same duties, and exercising the same supervisory responsibilities, as deputy chiefs of police, while five others assumed the duties and responsibilities of lieutenants. The unclassified employees occupy positions which involve the supervision of classified police and which are thus integral parts of the HPD's civil service hierarchy. Accordingly, the placement of unclassified employees in those positions contravened the Act.

*Lee*, 807 S.W.2d at 295.

Excerpts from the supreme court's opinion read:

The only positions that require law enforcement training, the court [of appeals] reasoned, are those that involve traditional law enforcement duties. Thus, the court concluded that the Act encompasses only those employees who actually do "police work;" [sic] that is, those who enforce the law, make arrests, and conduct criminal investigations. We disagree.

*Id.* at 292.

For every classified employee, the civil service system offers a career ladder, whereby the officer may work his or her way upward through the ranks. The various ranks, like rungs on a ladder, must comport with the system as a whole; that is, they must be filled by competitive examination, open to all who meet the basic statutory requirements. The Act does provide special procedures for appointment to positions at the very top of the ladder. At subordinate levels, however, the civil service ladder must remain intact. All positions in the civil service hierarchy—that is, all classified positions, and all positions entailing the supervision of classified employees—must be classified, and all appointments to those positions must be made in accordance with the Act. (Citations omitted and footnote omitted).

*Id.* at 295.

The Act applies to any position requiring a competitive examination. Such an examination tests an applicant's 'knowledge of and qualifications for ... police

work and work in the police department,' as well as the applicant's 'general education and mental ability.' We conclude, then, that the Act applies to any position requiring proficiency in all of those areas. If a particular position requires substantial knowledge of 'police work and work in the police department,' then it must be classified.

*Id.* at 294.

While *Lee v. City of Houston* deals only with personnel in the police department, we believe that the logic, reasoning, and holding in that case applies to the instant case and dictates a reversal of the judgment of the trial court.

We find that the plaintiffs' right to maintain the disputed positions within the Municipal Civil Service system has been violated in that the challenged ordinance transfers firefighter positions to civilians in contravention of specific terms of the TEX. REV.CIV.STAT.ANN. art. 1269m, in force at all times pertinent to this appeal. We further find that "civilianization" of the firefighter positions would not be more satisfactory to the public in general; therefore, the "civilianization" of the affected positions in the City's fire department was not in good faith. This is so even though: 1) the fire plans checker's duties primarily involve review of construction plans, sprinkler plans, and fire alarm plans for compliance with fire codes and occupancy requirements; the duties also involve conferring with architects and reviewing engineering and drafting principles and practices; 2) neither position, fire inspector nor fire plans checker, requires firefighting experience or qualification in the lower firefighter position or classification; and 3) in EMS Dispatch, many of the reasons for using firefighters and paramedics, respectively, no longer exist, since firefighting training is not necessary for an individual to perform the duties of fire dispatcher or EMS dispatcher, and with the implementation of computers, the dispatcher no longer needs to know where the fire stations or EMS ambulances are located.

■ We hold that persons in the positions of plans checkers, fire inspectors, fire

dispatchers and EMS dispatchers are fire-fighters within the express definition of TEX.REV.CIV.STAT.ANN. art. 1269m (now Section 143.003), and that such persons must be appointed to the positions through competitive examination in accordance with the Municipal Civil Service merit system. Plaintiffs' first point of error is sustained.

Plaintiffs contend in their second point of error that "[a]ssuming, arguendo, that the District Court found that Appellee [the City] did not abolish classified positions in the Fire Department when it "civilianized" positions in Fire Prevention, Fire Dispatch, and EMS Dispatch, the evidence in support of such ruling is factually and legally insufficient to support the judgment." We agree.

■ In reviewing a claim of legal insufficiency of evidence, the court will consider only evidence and inferences which, viewed in a light most favorable to the judgment, tend to support the judgment. *Glover v. Texas General Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981). On the other hand, where a party alleges that the evidence is factually insufficient to support the judgment, the appellate court must consider all evidence to determine if the evidence supporting the judgment is so weak or evidence to the contrary is so overwhelming that the judgment should be set aside. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

There are no sworn classifications in the fire department for the positions of fire inspector and plans checker. However, those positions have been held by sworn personnel in the classifications of fire lieutenant and fire captain for many years. Although the class specifications for fire captains and fire lieutenants do not specifically describe the job duties of plans checker and fire inspectors, this does not negate the fact that the fire department has consistently retained enough sworn positions of fire captain and fire lieutenant to provide some of those positions to staff the plans checker and fire inspector slots.

Sworn personnel in any particular class specification may be called upon to perform many different types of positions within the fire department. For example, a fire lieutenant may be asked to fill a position in Fire Suppression, in EMS, in Fire Prevention, in Dispatch, and in the Airport Crash Rescue division. The class specification for a fire lieutenant does not describe duties for any of these various positions except that of Fire Suppression. It is perhaps for that reason that the class specification for fire lieutenant states, under "duties": "Any one position may not include all of the duties listed nor do the listed examples include all tasks which may be found in positions of this class." The class specification is simply not designed to list all the different types of positions that the class might be expected to handle. Indeed, the class specifications for fire lieutenant and fire captain, while obviously describing different positions, are identical under the "duties" sections of the specifications.

■ A ruling that no positions have been abolished, in the facts and circumstances of this case, merely because there are no specific class specifications for plans checkers and fire inspectors ignores reality. For years, sworn personnel have occupied those positions in Fire Prevention which was described in the fire department's rules and regulations. The fire marshal, the assistant fire marshal, arson investigators, dispatchers, communications officers, and EMS personnel likewise fill their positions and perform their duties without benefit of a class specification.

In staffing new fire stations, no classified positions were eliminated; instead, classified personnel were simply moved from one department or station to the new station. Thus, no classified firefighter actually lost his (her) job. No classified positions were "abolished." As to the void created in Fire Prevention as a result of the removal of classified positions and employees, that void was filled by the creation of new civilian positions to perform the functions of plans checker and fire inspector previously performed by sworn personnel. The undisputed facts show that the City, rather than creating new classifications, merely transferred the sworn (classi-

fied) positions from existing fire stations to new stations and illegally filled the vacancies thus created with civilians.

The undisputed facts in this case show that the City abolished positions in its Fire Prevention division which had been occupied by sworn personnel for many years prior to the filing of this suit. The fact that the City had a need for additional personnel in Fire Suppression due to the creation of new fire stations does not obviate the fact that sworn positions in the Fire Prevention division were abolished. Any implied finding by the trial court to the contrary contravenes the public policy sought to be protected by article 1269m, and is factually and legally insupportable. Plaintiffs' second point of error is sustained.

Plaintiffs further contend, in their third point of error, that the trial court erred in failing to find that the individual plaintiffs were entitled to promotion to the position of fire lieutenant retroactive to the dates the City illegally civilianized positions in the fire department's fire prevention unit. We agree.

As before noted, the staffing of the three newly created fire stations was a budget mandate; the City was required to staff those stations; the staffing required, among other personnel, six fire lieutenant positions. The City filled these positions by transferring six fire lieutenants from Fire Prevention to the new stations and filled the vacancies thus created with civilians. Since we have held that it was illegal to civilianize those positions in Fire Prevention, the City was required to create six additional classifications in the fire lieutenant classification.

The case law is replete with examples where firefighters have been provided retroactive promotion and back pay where it was found that the City in question failed to fill a vacant position within the sixty or ninety days as required by the Civil Service Act. *See International Ass'n of Fire-Fighters, Local Union No. 936 v. Townsend*, 622 S.W.2d 562 (Tex.1981); *Duckett v. City of Houston*, 495 S.W.2d 883 (Tex. 1973); *Wallace*, 338 S.W.2d at 154; *Burk-*

*hart v. Moore*, 580 S.W.2d 108 (Tex.Civ. App.—Eastland 1979, no writ).

■ A vacancy occurs whenever an existing position is vacated or a newly created position is established by ordinance. *Duckett*, 495 S.W.2d at 886–87. That vacancy must be filled within sixty days of its creation if a promotional list exists at the time the vacancy occurs. TEX.LOC.GOV'T CODE ANN. § 143.036(e). In the case at bar, when the three new fire stations were staffed, the six individual plaintiffs occupied positions seven to twelve on the fire lieutenant list for promotion. Presumably, they were entitled to promotions when the new fire stations were staffed unless the City established that they would not have been promoted despite their being at the top of the eligibility list. *Duckett*, 495 S.W.2d at 887; *Michna v. City of Houston*, 521 S.W.2d 331, 333 (Tex.Civ.App.—Houston [1st Dist.] 1975, no writ). Whenever a vacancy occurs, the person next in line on the promotion list has the primary right to fill the vacancy.

■ As it did in this case, the City could have transferred existing fire lieutenants from positions in Fire Prevention to the new stations. However, this would have created six vacancies in fire inspector and plans checker positions in Fire Prevention. Alternatively, the City could have left the existing fire lieutenants in Fire Prevention, in which case it would have had six fire lieutenant vacancies in the new fire stations. Either way, the City would have been required to create and promote six additional fire lieutenants. The only way the City could have filled all these positions, which admittedly were necessary, without creating and promoting six additional lieutenants, was to fill the positions with civilians, a course which we have held to be illegal. The result of the City's illegal actions was to deprive the individual plaintiffs of the promotions they would have received had the City legally filled the fire lieutenant positions.

Had the City not illegally civilianized the fire lieutenant positions, the individual plaintiffs would have been entitled to promotions to fire lieutenant, as follows:

1. Plaintiff James C. Naegelin, effective June 3, 1987;
2. Plaintiff Robert C. Savage, effective July 11, 1987;
3. Plaintiffs Alan E. Boozikee and Herman G. Cantu, effective November 18, 1987;
4. Plaintiffs Paul E. Vidal and Lawrence D. Sutton, III, effective July 22, 1988.

Therefore, plaintiff James C. Naegelin is entitled to be promoted to fire lieutenant, retroactive to June 3, 1987, and to recover from the City all pay and benefits lost as a result of the City's failure to promote him as of that date; plaintiff Robert C. Savage is entitled to be promoted to fire lieutenant, retroactive to July 11, 1987, and to recover from the City all pay and benefits lost as a result of the City's failure to promote him as of that date; plaintiffs Alan E. Boozikee and Homer G. Cantu are each entitled to be promoted to fire lieutenant, effective November 18, 1987, and each to recover from the City all pay and benefits lost as a result of the City's failure to promote each of them as of that date; and plaintiffs Paul E. Vidal and Lawrence O. Sutton, III are each entitled to be promoted to fire lieutenant, effective July 22, 1988, and each to recover from the City all pay and benefits lost as a result of the City's failure to promote each of them as of that date. Plaintiffs' third point of error is sustained.

■■■ Plaintiffs contend in their fourth point of error that the trial court erred when it failed to consider their request for an award of attorney's fees "under the Declaratory Judgment Act." We agree.

The trial court, when it considered plaintiffs' request for an award of attorney's fees under the Declaratory Judgment Act, mistakenly concluded that plaintiffs were not entitled to the declaratory relief sought by them, and consequently, were not entitled to recover attorney's fees. We hold that plaintiffs are entitled to such declaratory relief. Therefore, they are entitled to recover attorney's fees as may be proved by them. *Lubbock Professional Fire-Fighters v. City of Lubbock,* 742 S.W.2d 413, 418 (Tex.App.—Amarillo 1987, writ

ref'd n.r.e.). Plaintiffs' fourth point of error is sustained.

The City contends in a cross-point that the trial court erred in requiring it to reassess its decision four years from the effective date of Ordinance 63227 because there is no pleading to support that portion of the judgment. We agree. The trial court's judgment decreed, in part:

[T]he City shall re-assess its decision four (4) years from the effective date of the ordinance, such reassessment to be completed prior to enactment of the budget ordinance for the following year.

■■■ "[A] judgment must be supported by the pleadings and, if not so supported, it is erroneous." *Cunningham v. Parkdale Bank,* 660 S.W.2d 810, 813 (Tex.1983).

■■■ Since we have held that the ordinance insofar as it civilianized classified positions in the fire department is invalid, it is not necessary to consider the cross-point. However, were we to consider it, we would hold that the judgment insofar as it required the City to re-assess its decision is void and of no effect because that portion of the judgment is not supported by pleadings.

We sever, reverse, and remand that portion of the judgment which denied attorney's fees to plaintiffs in order for the trial court to reconsider the propriety and amount, if any, of attorney's fees which may be awarded plaintiffs under the Declaratory Judgment Act. TEX.CIV.PRAC. & REM.CODE ANN. § 37.009 (Vernon 1986).

We reverse the remainder of the trial court's judgment which declared Ordinance 63227 of the City of San Antonio to be valid and render judgment that such ordinance, insofar as it provided for the civilianization of classified (sworn) positions previously held by firefighters classified under TEX. REV.CIV.STAT.ANN. art. 1269m, constitutes an abolishment of such positions in violation of the public policy of the State of Texas as evidenced by article 1269m, and is null and void and of no effect. We also grant the following relief and render judgment that the individual plaintiffs are to be

forthwith promoted by the City of San Antonio to the position of fire lieutenant, retroactive to the dates hereafter set out, as follows:

1. Plaintiff James C. Naegelin, retroactive to June 3, 1987;

2. Plaintiff Robert C. Savage, retroactive to July 11, 1987;

3. Plaintiffs Alan E. Boozikee and Herman G. Cantu, retroactive to November 18, 1987;

4. Plaintiffs Paul E. Vidal and Lawrence O. Sutton, III, retroactive to July 22, 1988.

We further render judgment that each of the individual plaintiffs, James C. Naegelin, Robert C. Savage, Alan E. Boozikee, Herman G. Cantu, Paul E. Vidal, and Lawrence O. Sutton, III have and recover judgment from the City of San Antonio all pay and benefits lost by them as a result of the City's failure to promote each of them to the position of fire lieutenant on the dates above set out.

REVERSED AND REMANDED IN PART and REVERSED AND RENDERED IN PART.